Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| NELSON DANIEL CENTENO<br><br>Apelante<br><br>v.<br><br>EL PUEBLO DE PUERTO RICO<br><br>Apelado | KLAN202300707 | Apelación Procedente del Tribunal de Primera Instancia, Sala Municipal de Fajardo<br><br>Civil Núm.: NSCR201600145 AL NSCR201600150<br><br>Sobre: Art. 93 (A) y Otros |

Panel integrado por su presidente, el Juez Bonilla Ortiz, el Juez Adames Soto, y el Juez Pagán Ocasio.

Pagán Ocasio, juez ponente

## SENTENCIA

En San Juan, Puerto Rico, a 5 de septiembre de 2025.

### I.

Comparece ante nosotros, el señor Nelson Daniel Centeno (señor Centeno o apelante), quien se encuentra privado de su libertad, y presentó una *Apelación criminal* en la que nos solicitó que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Fajardo (TPI o foro primario) el 17 de julio de 2023, notificada y archivada en autos el mismo día.[2] Mediante esta, tras emitido el veredicto de culpabilidad por parte del jurado, el TPI condenó al señor Centeno a un total de ciento treinta y nueve (139) años de prisión, por la comisión de varios delitos.

El señor Centeno presentó una *Moción solicitando transcripción de oficio* mediante la cual nos solicitó que autorizáramos la

---

[1] Véase Orden Administrativa OATA 2023-145 del 15 de agosto de 2023.
[2] Véase Autos originales del caso.

Transcripción de la Prueba Oral (TPO) de oficio del juicio celebrado en su contra como método de reproducción de la prueba oral.

El 5 de septiembre de 2023, emitimos una *Resolución* en la que autorizamos la TPO de oficio. En consecuencia, se ordenó al TPI a reproducir la prueba oral y a remitirla a la Secretaría del Tribunal de Apelaciones y se ordenó a dicha Secretaría preparar la TPO y presentarla ante este panel. Además, se pormenorizó el trámite a seguir para el perfeccionamiento del recurso.

El 13 de octubre de 2023, la Secretaría del Tribunal de Apelaciones presentó una *Moción en cumplimiento de orden* en la que informó haber recibido la regrabación y el turno en que se encontraba para su transcripción, turno número catorce (14).

El 18 de octubre de 2023, emitimos una *Resolución* en la que nos dimos por enterados de la *Moción en cumplimiento de orden* presentada por la Secretaría del Tribunal de Apelaciones con relación al estatus de la transcripción.

El 17 de enero de 2024, emitimos una *Resolución* en la que ordenamos a la Secretaría del Tribunal de Apelaciones, en un término de diez (10) días, informar el estatus de la TPO de oficio.

El 19 de enero de 2024, la Secretaría del Tribunal de Apelaciones presentó una *Moción en cumplimiento de orden* en la que informó el estatus de la TPO e informó que hacía el turno número nueve (9).

En seguimiento, el 22 de mayo de 2024, emitimos una *Resolución* en la que ordenamos a la Secretaría del Tribunal de Apelaciones, en un término de diez (10) días, informar el estatus de la TPO de oficio.

Ese mismo día, la Secretaría del Tribunal de Apelaciones presentó una *Moción en cumplimiento de orden* en la que informó el estatus de la TPO e informó que hacía el turno número (6).

El 31 de octubre de 2024, la Secretaría del Tribunal de Apelaciones presentó la TPO ordenada.

El 7 de noviembre de 2024, emitimos una *Resolución* en la que acogimos la TPO y ordenamos a que se notificara al apelante y al Procurador General sobre la presentación de la TPO. Consecuentemente, concedimos al apelante hasta el 16 de diciembre de 2024 para presentar su alegato suplementario y, al Procurador General, hasta el 16 de enero de 2025 para presentar su oposición.

El 18 de noviembre de 2024, el señor Centeno presentó una *Moción al amparo del debido proceso de ley solicitando orden de objeciones y estipulaciones de la transcripción de la prueba oral del juicio en su fondo y término para presentar alegato* en la que solicitó la oportunidad de revisar la TPO de oficio para realizar estipulaciones y objeciones entre las partes.

Ese mismo día, el Pueblo de Puerto Rico presentó una *Moción de reconsideración de Resolución del 7 de noviembre de 2024* en la que solicitó que reconsideremos la *Resolución* emitida el 7 de noviembre de 2024 con el propósito de que le concedamos un término para revisar la TPO y, consecuentemente, un nuevo término a partir de la corrección de la TPO para presentar el alegato en oposición.

El 4 de diciembre de 2024, emitimos una *Resolución* en la que dejamos sin efecto la *Resolución* del 7 de noviembre de 2024 y en su lugar, concedimos a las partes un término final de diez (10) días para examinar la TPO y realizar los esfuerzos razonables para estipularla y presentar cualquier objeción. Además, concedimos al apelante un término de treinta (30) días, contados a partir de que fuera acogida la TPO para presentar su alegato. Asimismo, concedimos al Procurador General un término de treinta (30) días a partir de que el apelante presentase su alegato para presentar su oposición al recurso.

El 2 de diciembre de 2024, el Pueblo de Puerto Rico presentó una *Moción para informar las enmiendas a la transcripción de la prueba oral y solicitud de remedio* en la que solicitó que se deje sin efecto la orden para presentar los alegatos y se ordene la incorporación de las enmiendas propuestas por la parte apelada y se conceda un nuevo término para presentar los alegatos.

El 16 de diciembre de 2024, el señor Centeno presentó una *Moción informativa* en la que informó que estaba de acuerdo con las enmiendas propuestas por la parte apelada, no obstante, señaló que parte del testimonio del Agente Raúl Velázquez Paz no fue incluido en la transcripción por lo cual solicitó que se le conceda un término de diez (10) días a partir de la notificación de la transcripción corregida para presentar objeciones o estipular el testimonio faltante.

El 19 de diciembre de 2024, emitimos una *Resolución* en la que acogimos las enmiendas a la TPO según estipuladas por las partes. Además, ordenamos a la Secretaría del Tribunal de Apelaciones a completar la TPO, en lo referente al testimonio del Agente Raúl Velázquez Paz.

El 27 de diciembre de 2024, la Coordinadora de Grabación del TPI presentó una *Moción de comparecencia especial* en la que informó haber enviado la grabación del testimonio del Agente Raúl Velázquez Paz a la Secretaría del Tribunal de Apelaciones.

La Secretaría de este tribunal dio cumplimiento a lo ordenado. El 9 de enero de 2025, emitimos una *Resolución* en la que concedimos a las partes hasta el 17 de enero de 2025 para revisar la TPO, realizar esfuerzos para estipularla y presentar cualquier objeción.

El 14 de enero de 2025, el Pueblo de Puerto Rico presentó una *Moción para informar objeciones a la transcripción enmendada de la*

*prueba oral* en la que solicitó que se ordenara la incorporación de unas enmiendas propuestas a la TPO.

El 16 de enero de 2025, emitimos una *Resolución* en la que ordenamos a la Secretaría de este Tribunal a enmendar la TPO, a tenor con los anejos de la moción presentada por el Pueblo de Puerto Rico el 14 de enero de 2025.

El 17 de enero de 2025, el señor Centeno presentó una *Moción en cumplimiento de orden para informar objeciones a la transcripción de la prueba oral enmendada* en la que solicitó que ordenemos la incorporación de la lista de correcciones o enmiendas conjuntamente solicitadas a la TPO.

El 24 de enero de 2025, emitimos una *Resolución* en la que acogimos la TPO con sus enmiendas. Además, concedimos al apelante un término de treinta (30) días para presentar su alegato.

El 30 de enero de 2025, el señor Centeno presentó una *Moción al amparo de la Regla 77 del Reglamento del Tribunal de Apelaciones, de la Regla 199 de Procedimiento Criminal y del Debido Proceso de Ley* mediante la cual solicitó que ordenáramos elevar los autos del caso. Solicitó, además, que ordenáramos a la Secretaría del Tribunal de Apelaciones enmendar la TPO con las correcciones estipuladas.

El 4 de febrero de 2025, emitimos una *Resolución* en la que ordenamos a la Secretaría del TPI remitir al Tribunal de Apelaciones los autos originales del caso con la evidencia documental y física desfilada ante sí. Con relación a la solicitud de enmienda a la TPO, instamos al apelante a ver lo dispuesto en la *Resolución* emitida el 24 de enero de 2025.

El 5 de marzo de 2025, en virtud de que recibimos los autos originales del caso, emitimos una *Resolución* en la que concedimos treinta (30) días al apelante para presentar su alegato.

El 7 de marzo de 2025, la Lcda. Lourdes Velazco Otero presentó una *Moción de relevo de representación legal* en la que

informó que renunció a la División de Apelaciones de la Sociedad para Asistencia Legal por lo que solicitó su relevo como representante legal del apelante.

El 11 de marzo de 2025, la División de Apelaciones de la Sociedad para Asistencia Legal presentó una *Moción informativa urgente* en la que, dado a la renuncia de la abogada a cargo del caso, solicitó una prórroga para presentar el alegato.

El 13 de marzo de 2025, emitimos una *Resolución* mediante la cual relevamos a la Lcda. Lourdes Velazco Otero de la representación legal del apelante y concedimos a la Sociedad para Asistencia Legal hasta el 18 de abril de 2025, como término final, para presentar su alegato.

El 21 de abril de 2025, el señor Centeno presentó un *Alegato del apelante,* por conducto de una nueva representación legal, en el que solicitó la revocación de las sentencias apeladas.

El 21 de mayo de 2025, el Pueblo de Puerto Rico presentó un *Alegato del Pueblo de Puerto Rico* en el que solicitó que confirmemos las sentencias apeladas.

Recibida la prueba documental según ordenado y contando con la comparecencia de las partes, damos por perfecciona la apelación criminal de epígrafe. En adelante, pormenorizamos los hechos procesales pertinentes para la atención del recurso.

**II.**

El caso de marras tuvo su génesis en hechos ocurridos el 4 de enero de 2016, cuando el señor Juan Raúl Santiago Osorio (señor Santiago Osorio) fue asesinado. Por esos hechos, el Ministerio Público radicó seis (6) denuncias contra el apelante por los delitos de: asesinato en primer grado, tentativa de asesinato, escalamiento agravado, portación y uso de armas de fuego sin licencia y dos (2) cargos por apuntar y disparar un arma de fuego. En resumen, al señor Centeno se le imputó dar muerte, de forma premeditada y con

propósito, con un arma de fuego, al señor Juan Ramón Santiago Osorio (señor Santiago Osorio) al penetrar en el área del patio de la residencia de sus padres. Asimismo, se le imputó realizar actos inequívocamente dirigidos a ocasionar la muerte del señor Juan Santiago García, haciendo uso de un arma de fuego, causándole heridas de bala, no logrando su propósito de matar por causas ajenas a su voluntad. Se le imputó, además, penetrar en la residencia del señor Santiago García, para cometer los antedichos hechos, y haberle apuntado y disparado, con un arma de fuego para la cual no tenía licencia, a los señores Santiago García y Santiago Osorio.

El 7 de marzo de 2016, se celebró la Vista Preliminar, en la que se determinó causa probable para todos los delitos imputados y, ante el resultado, el Ministerio Público presentó los pliegos acusatorios para cada uno de los delitos.[3]

Luego de transcurridos los trámites procesales de rigor, el 25, 26, 27 de febrero de 2020, 9, 10, 11, 12 de marzo de 2020 y 18 de noviembre de 2020 se celebró el Juicio en su Fondo por jurado. La prueba testifical consistió en los testimonios de las siguientes personas: (1) el Agente Juan Rivera Reyes (Agte. Rivera Reyes), agente de servicios técnicos; (2) el Agente José Lebrón Alicea (Agte. Lebrón Alicea), agente de homicidios; (3) la señora Jannette Santiago Osorio (señora Santiago Osorio)—hermana del señor Santiago Osorio—; (4) Juan Ramón Santiago García (señor Santiago García) —padre del señor Santiago Osorio—, quien presenció los hechos; (5) Agente Raúl Omar Velázquez Paz (Agte. Velázquez Paz), agente de homicidios; (6) el señor Abdiel Ramírez Negrón (señor Ramírez Negrón), examinador de armas del Instituto de Ciencias Forenses

---

[3] Autos originales del caso.

(ICF); (7) la Doctora Rosa Rodríguez Castillo (Dra. Rodríguez Castillo), patóloga forense.

La prueba documental consistió en diez (10) Exhibits presentados por el Ministerio Público identificados como: *Exhibit* 1a-gg, treinta y tres (33) fotos; *Exhibit* 2, croquis de la escena; *Exhibit* 3, siete (7) fotos; *Exhibit* 4, solicitud de servicio forense y cadena de custodia; *Exhibit* 5a y 5b, casquillo y sobre; *Exhibit* 6, foto del occiso; *Exhibit* 7a y 7b, acta sobre rueda de confrontación y muestrario de confrontación fotográfica; *Exhibit* 8, solicitud de análisis y cadena de custodia de evidencia; *Exhibit* 9, certificado de examen; y, *Exhibit* 10, informe médico forense PAT-0084-16.

A continuación, pormenorizamos las porciones de la TPO atinentes a los errores señalados por el apelante en el recurso de epígrafe.

**Testimonio del Agte. Rivera Reyes**

El Agte. Rivera Reyes, quien expresó que estaba adscrito a la Unidad de Servicios Técnicos del CIC de Fajardo[4], en resumen, declaró que:

Su función es asistir al agente investigador y al fiscal en la escena de un crimen, recopilando la evidencia, enumerándola y documentándola.[5] Para el 4 de enero de 2016, estaba de turno y aproximadamente a eso de las 5:20pm a 5:25pm, el supervisor, el señor Wilfredo Santos, le indicó que se preparara porque había una escena de asesinato en la calle 3 de la Urb. Vevé Calzada.[6] Cuando llegó al lugar, allí se encontraba el Agte. Ángel Vázquez custodiando la escena, el cual le dijo que había un occiso y una persona herida en el hospital.[7] El Agte. Rivera Reyes comenzó a tomar fotografías de

---

[4] Véase la Transcripción de la Prueba Oral (TPO), pág. 23, líneas 27-29 a la pág. 24, líneas 1-2.
[5] Íd., pág. 24, líneas 20-27.
[6] Íd., pág. 31, líneas 4-14.
[7] Íd., pág. 32, líneas 11-20.

la escena.[8] A preguntas sobre los casquillos que ocupó en la escena, declaró que solo encontró casquillos .40.[9] Este enumeró siete (7) piezas de evidencia en el lugar de la escena, siendo cinco (5) casquillos, el occiso y un (1) celular, lo cual documentó en el croquis que preparó.[10] Luego de culminar de trabajar la escena, pasó al Hospital Hima San Pablo de Fajardo donde se encontraba el padre del occiso, el señor Santiago García, quien fue herido de bala con relación a la misma escena y al cual le tomó fotografías.[11]

Durante el proceso de investigación, el Agte. Rivera Reyes solicitó al Instituto de Ciencias Forenses (ICF) comparación microscópica y determinación de tipo y calibre de los cinco (5) casquillos recolectados.[12]

A preguntas del contrainterrogatorio, el Agte. Rivera Reyes respondió que no dibujó los árboles ubicados en la residencia donde ubica la escena en el croquis.[13] Tampoco entrevistó a ningún vecino.[14] El padre del occiso, a quien fue a ver al hospital para la toma de fotografías no le dio descripción física ni nombre del sospechoso.[15] El Agte. Rivera Reyes no ocupó arma de fuego como evidencia.[16]

Mientras que en el examen re directo, respondió que la persona encargada de una investigación, de entrevistar a los testigos y a las personas que puedan tener conocimiento de los hechos es el agente de homicidios, en este caso, el Agte. Velázquez Paz.[17] Mientras que, su rol es proteger la escena y recuperar la evidencia.[18] Respondió

---

[8] Íd., pág. 32, líneas 21-27.
[9] Íd., pág. 49, líneas 13-14.
[10] Íd., pág. 56, líneas 1-11.
[11] Íd., pág. 60, líneas 23-29 a la pág. 61, líneas 1-10 y líneas 14-20.
[12] Íd., pág. 68, líneas 2-9.
[13] Íd., pág. 94, líneas 12-16.
[14] Íd., pág. 102, líneas 13-16.
[15] Íd., pág. 104, líneas 9-22.
[16] Íd., pág. 106, líneas 14-15
[17] Íd., pág. 107, líneas 2-8.
[18] Íd., pág. 107, líneas 9-12.

que no había impedimento de árboles o arbustos para él observar la parte interior de la escena, así como la exterior.[19]

**Testimonio del Agte. Lebrón Alicea**

El Agte. Lebrón Alicea, quien expresó que estaba adscrito a la División de Homicidios de la Policía de Fajardo[20], declaró que:

Recibió instrucciones de su supervisor para reincorporarse en servicio porque había ocurrido un asesinato en la Urb. Vevé Calzada.[21] Este debía dirigirse al Hospital Hima San Pablo de Fajardo donde se encontraba el padre del occiso para que le brindara protección y lo entrevistara sobre lo ocurrido.[22] Al llegar al hospital, preguntó por la persona herida de bala, quien resultó ser el señor Santiago García.[23] Declaró que cuando comenzó a entrevistarlo, el señor Santiago García le narró que se encontraba sentado en la parte de afuera de su casa y que vio a dos individuos, uno de ellos en caballo y otro a pie, rondando la casa y que luego llegó su hijo, el señor Santiago Osorio.[24] El Agte. Lebrón Alicea declaró que el señor Santiago García le describió a la persona que estaba a pie y que les disparó a él y a su hijo como flaquita, bajita, tez trigueña, estilo jaquetón y con la nariz aplastada como si fuera boxeador, que era de la playa Puerto Real y que le decían Nelsito, mientras que el otro que andaba a caballo era de calle Chiquita.[25] El Agte. Lebrón Alicea le entregó las notas recopiladas en sala de emergencias a su compañero a cargo del caso, el Agte. Velázquez Paz.[26]

A preguntas en el contrainterrogatorio, el Agte. Lebrón Alicea respondió que el señor Santiago García no le dijo que conocía a la persona que iba a pie, ni que había pasado primero al frente de su

---

[19] Íd., pág. 111, líneas 6-12.
[20] Íd., pág. 124, líneas 8-9.
[21] Íd., pág. 125, líneas 1-10.
[22] Íd., pág. 125, líneas 18-23.
[23] Íd., pág. 126, líneas 1-3.
[24] Íd., pág. 126, líneas 25-30.
[25] Íd., pág. 127, líneas 1-9.
[26] Íd., pág. 127, líneas 10-15.

casa dirigiéndose a Montalvo.[27] No obstante, respondió que sí le dijo que se quedó mirando a las personas que estaban rondando, pero no le dio descripción física de la persona que iba a caballo.[28]

A preguntas del examen re-directo, declaró que hizo una entrevista preliminar porque él no era el agente del caso por lo que preguntó en general sobre lo que había sucedido y no en detalle.[29]

**Testimonio de la señora Janette Santiago Osorio**

La señora Santiago Osorio, quien expresó que era la hermana del occiso Juan Raúl Santiago Osorio[30], declaró que:

Al día siguiente de los hechos, fue al ICF en donde le mostraron unas fotos de su hermano, el señor Santiago Osorio, para su identificación.[31]

A preguntas del contrainterrogatorio, declaró que fue entrevistada en el ICF sobre las circunstancias en que ocurrió la muerte de su hermano y allí relató lo que escuchó cuando llegó a la escena y lo que le pudo haber dicho su padre cuando se encontraba en sala de emergencias porque no presenció los hechos.[32] Respondió que no dio una descripción de la persona sospechosa a la entrevistadora del ICF, ni mencionó que hubiese una persona que estaba montada en caballo.[33]

**Testimonio del señor Juan Ramon Santiago García**

El señor Santiago García, quien expresó ser el padre del occiso Juan Santiago Osorio e identificó a la persona acusada que se encontraba en sala como la persona que mató a su hijo[34], declaró que:

---

[27] Íd., pág. 128, líneas 8-24.
[28] Íd., pág. 130, líneas 1-5 y líneas 13-17.
[29] Íd., pág. 135, líneas 15-26.
[30] Íd., pág. 140, líneas 22-27.
[31] Íd., pág. 141, líneas 6-20.
[32] Íd., pág. 142, líneas 13-21 y líneas 27-29; pág. 143, líneas 1-2 y líneas 26-30.
[33] Íd., pág. 145, líneas 20-23, a la pág. 146, líneas 7-23.
[34] Íd., pág. 149, líneas 17-25.

Para el 4 de enero de 2016, se encontraba en su residencia en la Urb. Vevé Calzada, en donde a eso de las 4:00pm aproximadamente salió a la parte trasera a descansar y a vender tapa bocinas como solía hacer a esa hora.[35] Estaba solo, sentado en un mueble que tenía debajo de una carpa ubicada al lado izquierdo del portón, en lo que llegaba su hijo.[36] Mientras estaba allí sentado, pasó una persona que no conocía.[37] En sala, señaló que había sido el acusado.[38] Testificó que esa persona iba en dirección de la Ave. Conquistador hacia Montalvo, con un guillecito de jaque, caminando por allí y como él no confía en nadie, se le quedó mirando mientras la persona pasó de donde él estaba sentado.[39] Respondió que su patio está cerrado con *cyclon fence* con dos portones en el centro, que él estaba del lado de la verja y el acusado pasó por la carretera.[40] El señor Santiago García declaró que lo vio que iba caminando y como lo vio raro, cuando pasó, él se levantó y salió del portón a la calle a observarlo para ver a dónde iba.[41] Describió a la persona que iba caminando como trigueño, con nariz de boxeador.[42] Este llevaba puesto un suéter, un pantalón ni largo ni corto, tenis y gorra, de diferentes colores y tenía barba.[43]

El señor Santiago García declaró que se asomó al portón y vio a la persona cuando caminaba en dirección a Montalvo y se paró a llamar a otra persona que estaba con unos caballos.[44] Expresó que conoce la casa en donde estaba el muchacho de los caballos porque eran vecinos de muchos años y que, en ese momento, se volvió a sentar y llegó su hijo.[45] Este le dijo a su hijo que una persona había

---

[35] Íd., pág. 150, líneas 7-10 y líneas 23-27.
[36] Íd., pág. 151, líneas 4-11.
[37] Íd., pág. 151, líneas 12-16
[38] Íd., pág. 151, líneas 17-20.
[39] Íd., pág. 151, líneas 21-29.
[40] Íd., pág. 152, líneas 1-7.
[41] Íd., pág. 153, líneas 14-18.
[42] Íd., pág. 153, líneas 19-25.
[43] Íd., pág. 153, líneas 29-30, a la pág. 154, líneas 6-13.
[44] Íd., pág. 155, líneas 11-29.
[45] Íd., pág. 155, líneas 30, a la pág. 156, líneas 1-12.

pasado por la casa con "guillecito de jaco" a ver si lo conocía, quien venía en camino junto a otra persona a caballo, y le dijo a su hijo de quién se estaba refiriendo.[46] Según declaró, su hijo le respondió que a él le dicen "Nelsito" y es del caserío la Playa y que cuando le iba a responder sobre la otra persona, el señor Santiago García le dijo que a ese lo había visto y que era de calle Chiquita.[47] Declaró que una vez estos pasan frente a su casa se detienen un poco más adelante del portón.[48] La persona que iba a caballo dio la vuelta y quedó mirando para Montalvo y, entre ellos, estaban conversando y el señor Santiago García se les quedó mirando.[49] En cuestión de segundos, el señor Centeno entró al portón y el señor Santiago García lo que escuchó fue una denotación, lo cual inicialmente pensó que era un cuarto de dinamita que le habían lanzado a su hijo para asustarlo.[50] Se sintió herido y supo que fue una bala.[51] Ahí, el señor Centeno entró por el portón y, con un arma como la que usa la policía, comenzó a dispararles a su hijo y a él.[52] En ese momento, su hijo le lanzó una silla al señor Centeno y se fue al frente del señor Santiago García y lo protegió de los disparos.[53] Luego, dejó de escuchar los disparos y ya el señor Centeno se había ido, le preguntó a su hijo si estaba bien a lo que le respondió que sí pero luego se desplomó y fue cuando vio sangre. [54] Respondió que el señor Centeno salió de su casa en dirección de Montalvo a la Ave. Conquistador.[55]

El señor Santiago García posteriormente fue llevado a sala de emergencias del Hospital Hima San Pablo porque había perdido

---

[46] Íd., pág. 157, líneas 1-8.
[47] Íd., pág. 157, líneas 17-24
[48] Íd., pág. 157, líneas 27-29.
[49] Íd., pág. 158, líneas 1-7.
[50] Íd., pág. 158, líneas 21-26.
[51] Íd., pág. 158, líneas 28-29.
[52] Íd., pág. 159, líneas 1-10.
[53] Íd., pág. 159, líneas 13-20.
[54] Íd., pág. 160, líneas 2-10.
[55] Íd., pág. 160, líneas 16-22.

mucha sangre.[56] Respondió que en la escena no le dio información a nadie sobre lo sucedido.[57] Cuando fue llevado al hospital, llegó un agente que le pido información a lo que le respondió que no le iba a dar información a nadie pero luego accedió y le dijo que cuando estaba hablando con su hijo, este le había dicho que la persona que les disparó se llamaba Nelsito y que vivía en el caserío de la playa.[58]

Esa noche, el señor Santiago García fue llevado al Centro Médico y allí llegó el Agte. Velázquez con otro compañero quienes le dijeron que cuando se sitiera mejor querían hablar con él.[59] Cuando salió del hospital, se reunió con el Agte. Velázquez y le explicó lo que había pasado esa tarde y este le dijo que al día siguiente lo buscaría para ir al CIC.[60] Al día siguiente, fue a un *line up* de fotografías en donde identificó a la fotografía con el número 3 como la persona que les disparó y a quien señaló al acusado en sala como la persona que estaba en esa foto.[61] El señor Santiago García respondió que identificó al número 3 porque esa cara nunca se le iba a olvidar.[62] Además, respondió que en su casa había unos árboles, pero la verja estaba limpia y podía ver hacia afuera y ver la persona que venía caminando.[63]

A preguntas del contrainterrogatorio, respondió que no conocía ni había visto antes a esa persona que vio pasando por su casa.[64] Respondió que se fijó en la cara de la persona y su vestimenta y no le vio tatuajes.[65] Reconoció que en la declaración jurada no dijo que estaba sentado debajo de la carpa.[66] Tampoco que se levantó de la silla a salir del portón y mirar al muchacho

---

[56] Íd., pág. 161, líneas 20-25.
[57] Íd., pág. 161, líneas 26-30, a la pág. 162, líneas 1-9.
[58] Íd., pág. 162, líneas 13-25.
[59] Íd., pág. 163, líneas 6-13.
[60] Íd., pág. 164, líneas 24-27.
[61] Íd., pág. 165, líneas 1-14.
[62] Íd., pág. 176, líneas 16-19.
[63] Íd., pág. 180, líneas 12-20.
[64] Íd., pág. 190, líneas 23-29.
[65] Íd., pág. 195, líneas 18-30, a la pág. 196, líneas 1-4.
[66] Íd., pág. 201, líneas 25-30.

cuando iba caminando por la carretera.[67] Respondió que no le dijo a su esposa ni a su hija que su hijo le había dicho que el que la persona que estaba a pie se llamaba Nelsito, ni les dio descripciones físicas.[68] Tampoco le dio descripciones de la persona que disparó, ni el nombre que su hijo le dijo, al primer agente que llegó a la escena.[69] Respondió que no le vio arma a la persona que iba a pie cuando paso por primera vez.[70]

A preguntas del examen re-directo, respondió que mientras estaba en el asiento vio de frente al acusado cuando iba pasando.[71]

**Testimonio del Agte. Raúl Omar Velázquez Paz**

El Agte. Velázquez Paz, quien expresó que estaba adscrito a la División de Homicidios de la Policía[72], declaró que:

Su función es trabajar con crímenes violentos, entre estos, asesinatos.[73] Para el 4 de enero de 2016, a eso de las 5:30pm-5:40pm lo llamó su supervisor el Sargento Samuel Ortiz quien le indicó que había ocurrido un asesinato en la Urb. Vevé Calzada y, como estaba de turno, se dirigió al lugar.[74] Al llegar, se identificó con el agente de distrito, el Agte. Vázquez, para que le diera los datos preliminares de la escena.[75] Observó que la escena ya estaba acordonada, que dentro de la residencia Q32 había un cuerpo en el área del patio, que había una verja de *cyclone fence* y muchos tapa bocinas en la parte trasera.[76] Cuando llegó a la escena, estaba de día.[77] Comenzó a hacer una búsqueda lineal con el Agte. Rivera Reyes de servicios técnicos, quien estaba tomando las fotografías.[78] Las piezas que encontró fueron unos casquillos y un celular, las

---

[67] Íd., pág. 203, líneas 7-11; pág. 205, líneas 14-18.
[68] Íd., pág. 222, líneas 8-29.
[69] Íd., pág. 223, líneas 1-7.
[70] Íd., pág. 231, líneas 12-15.
[71] Íd., pág. 231, líneas 21-27.
[72] Íd., pág. 243, líneas 27-30, a la pág. 244, líneas 4-5.
[73] Íd., pág. 244, líneas 16-20.
[74] Íd., pág. 246, líneas 17-22.
[75] Íd., pág. 246, líneas 25-29, a la pág. 247, líneas 1-3.
[76] Íd., pág. 247, líneas 17-24.
[77] Íd., pág. 247, líneas 28-30.
[78] Íd., pág. 248, líneas 1-7.

cuales identificó con números.[79] El Agte. Rivera Reyes comenzó a tomar las fotografías y luego levantaron la evidencia.[80] Describió el método de recolección de piezas de evidencia.[81] Procedieron a verificar el cuerpo, las heridas y la ropa que tenía puesta y lo desglosó en un documento que usa como parte de su investigación.[82] En el lugar, había una verja de *cyclone fence*, había unas sillas y el cuerpo estaba entre medio de las sillas, debajo de una carpa.[83] Declaró que desde donde estaba el cuerpo, podía mirar del interior de la carpa hacia afuera y que podía observar todo aun cuando había árboles, pero estos no estaban pegados y no obstruían la visibilidad.[84] Luego, el Agte Rivera Reyes y él se dirigieron al Hospital Hima San Pablo porque allí estaba el señor Santiago García, tras resultar herido.[85] Le tomó una fotografía y le dijo que cuando estuviera mejor lo iba a entrevistar.[86]

El Agte. Lebrón Alicea, quien estuvo en el hospital inicialmente con el señor Santiago García, le dijo que este señor le indicó que se encontraba con su hijo sentado en la parte de atrás de su residencia y que paso este muchacho con la nariz ancha, trigueñito, caminando medio jaco y que al preguntarle a su hijo quién era le dijo que era Nelsito del caserío la playa.[87] El Agte. Velazquez Paz, al escuchar el nombre, le respondió que era Nelson Centeno porque como parte de su trabajo sabía quién era él.[88] Este lo identificó en sala.[89]

De la entrevista con el señor Santiago García, este le dijo que se encontraba en la parte de atrás de su residencia, que se sentaba

---

[79] Íd., pág. 248, líneas 15-20.
[80] Íd., pág. 248, líneas 21-28.
[81] Íd., pág. 248, líneas 27-28, a la pág. 249, líneas 1-12.
[82] Íd., pág. 249, líneas 14-21.
[83] Íd., pág. 250, líneas 4-9.
[84] Íd., pág. 250, líneas 10-18.
[85] Íd., pág. 251, líneas 1-14
[86] Íd., pág. 251, líneas 15-20.
[87] Íd., pág. 251, líneas 23-29, a la pág. 252, l. 1-2.
[88] Íd., pág. 252, líneas 3-8.
[89] Íd., pág. 252, líneas 16-23.

allí todos los días y que su hijo le trajo un café y comenzaron a hablar a lo que él le preguntó a su hijo si conocía a la persona que iba pasando y su hijo le respondió que sí que era Nelsito del caserío la playa y que el otro muchacho que venía en caballo era de la calle Chiquita.[90] Le dijo al agente que las dos personas iban pasando frente a su residencia y que el señor Centeno entró y comenzó a dispararles y luego se fue corriendo hacia la Ave. Conquistador.[91] El señor Santiago García le dijo que la persona tenía nariz como boxeador, trigueñito, flaco, que estaba vestido con una gorra de lado, un pantalón ni corto ni largo, camisa y tenis de colores.[92]

El Agte. Velázquez Paz comenzó a hacer gestiones para localizar al señor Centeno para hacer un *line-up* personal pero no pudo localizarlo y se preparó un *line-up* fotográfico.[93] Describió la manera en que seleccionan a las personas para el *line-up* fotográfico.[94] Indicó que el señor Santiago García comenzó a ver las fotos y señaló al número tres (3) y dijo que esa era la persona que mató a su hijo y que lo hirió a él y lo circuló.[95] El Agte. Velázquez Paz señaló al acusado en sala como la persona con el número tres (3) en el *line-up*.[96] Luego de la identificación por el señor Santiago García, el Agte. Velázquez Paz lo llevó a la fiscalía para que le tomaran una declaración jurada.[97] Al día siguiente, se le radicaron cargos en ausencia al señor Centeno.[98]

Declaró que corroboró la versión que le dio el señor Santiago García con los casquillos de escena, con la ubicación del cuerpo de su hijo, el portón abierto, la verja y la silla.[99] Con relación al arma utilizada para esos hechos, declaró que la División de Balística del

---

[90] Íd., pág. 253, líneas 23-30.
[91] Íd., pág. 254, líneas 2-4.
[92] Íd., pág. 254, líneas 10-15.
[93] Íd., pág. 254, líneas 19-30, a la pág. 255, líneas 1-17.
[94] Íd., pág. 255, líneas 18-30, a la pág. 256, líneas 1-6.
[95] Íd., pág. 256, líneas 18-22.
[96] Íd., pág. 259, líneas 8-14.
[97] Íd., pág. 259, líneas 18-22.
[98] íd., pág. 259, líneas 26-30.
[99] Íd., pág. 260, líneas 19-25.

ICF le indicó que se utilizó un arma de fuego tipo pistola.[100] Entrevistó a la patóloga del ICF y con esta corroboró la versión del señor Santiago García de que su hijo lo protegió de los disparos porque las heridas que tenía el occiso fueron en el área de la espalda.[101]

Respondió que cuando volvió al lugar de los hechos corroboró que, de donde dijo que estaba sentado el señor Santiago García, se podía ver claramente hacia donde mencionó que vio al señor Centeno.[102] Respondió que el señor Santiago García podía ver desde allí claramente a la cara al señor Centeno pasando.[103] En virtud de la investigación del Agte. Velázquez Paz, el señor Centeno fue la persona autora de los hechos.[104]

A preguntas del contrainterrogatorio, respondió que ninguno de los vecinos que entrevistó identificó al señor Centeno como autor de los hechos.[105] Respondió que entrevisto a la persona que iba a caballo, de nombre Rodolfo, y este no le dijo que el señor Centeno fue la persona que disparó ese día.[106]

**Testimonio del señor Abdiel Ramírez Negrón:**

El señor Ramírez Negrón, quien expresó ser examinador de armas de fuego del ICF[107], declaró que:

Su trabajo es examinar toda la evidencia relacionada a las armas de fuego, como los casquillos, proyectiles de balas, balas, cartuchos de escopeta y armas de fuego.[108] Describió al jurado lo que constituye una bala.[109] Como parte de sus funciones, este realiza un examen microscópico de las piezas que recibe para

---

[100] Íd., pág. 261, líneas 9-15.
[101] Íd., pág. 261, líneas 16-26.
[102] Íd., pág. 275, líneas 11-16.
[103] Íd., pág. 275, líneas 17-22.
[104] Íd., pág. 281, líneas 5-10.
[105] Íd., pág. 281, líneas 27-29, a la pág. 282, líneas 1-3.
[106] Íd., pág. 293, líneas 15-27.
[107] Íd., pág. 314, líneas 17-23.
[108] Íd., pág. 315, líneas 3-7.
[109] Íd., pág. 315, líneas 24-30, a la pág. 316, líneas 1-6.

determinar sus características.[110] Describió al jurado la manera en que realiza la comparación microscópica.[111]

En su intervención con relación a los hechos del caso, examinó unos casquillos de bala y proyectiles, lo cual perpetuó en un certificado de examen.[112] Los proyectiles fueron sometidos por el área de patología del ICF a través de una solicitud de servicios forense.[113] De los resultados del informe sobre las piezas de evidencia que examinó, indicó que los casquillos de bala eran calibre .40 y fueron disparados por una misma arma de fuego.[114] También, que los proyectiles de bala y el blindaje de bala fueron disparados por una misma arma de fuego, de calibre .40.[115] A base de tales resultados, el señor Ramírez Negrón respondió que se utilizó un arma solamente para disparar las piezas de evidencia que examinó.[116] Por las características que presentaron los casquillos de bala y los proyectiles, indicó que pudo haber sido una pistola marca *Glock* la que los disparó y explicó la razón por la que llegó a esa conclusión.[117]

A preguntas del contrainterrogatorio, respondió que no podía concluir que los casquillos y los proyectiles salieron de una misma arma.[118] El señor Ramírez Negrón no tuvo un arma para comparar.[119] Mientras que a preguntas del examen re directo, explicó la razón por la que no podía llegar a esa conclusión.[120]

**Testimonio de la Dra. Rosa Rodríguez Castillo**

La Dra. Rodríguez Castillo, quien expresó ser patóloga forense del ICF[121], declaró que:

---

[110] Íd., pág. 316, líneas 22-29.
[111] Íd., pág. 317, líneas 1-29, a la pág. 318, líneas 1-2.
[112] Íd., pág. 319, 1ineas 26-29, a la pág. 320, líneas 1-2.
[113] Íd., pág. 320, líneas 8-13.
[114] Íd., pág. 330, líneas 1-12.
[115] Íd., pág. 330, líneas 17-30.
[116] Íd., pág. 331, líneas 27-30.
[117] Íd., pág. 332, líneas 1-17.
[118] Íd., pág. 336, líneas 7-17.
[119] Íd., pág. 336, líneas 18-20
[120] Íd., pág. 336, 1ineas 26-29, a la pág. 337, líneas 1-9.
[121] Íd., pág. 342, líneas 15-20.

Como parte de sus funciones, realiza autopsias para determinar la manera de muerte, imparte conferencias, asiste a seminarios, supervisa personal, hace cremaciones y asiste a los tribunales.[122] Explicó que los resultados de una autopsia se plasman de forma escrita.[123]

Sobre la autopsia que le realizó al señor Santiago Osorio, explicó que cuando examinó la superficie corporal, este presentaba ocho (8) heridas traumáticas que era compatibles con heridas de bala.[124] Describió al jurado dónde estaban ubicadas las heridas.[125] En cuanto a los proyectiles que recuperó dentro del cuerpo, declaró el proceso que realizó y cómo lo documentó.[126] Tras la autopsia, la Dra. Rodríguez Castillo concluyó que la causa de muerte del señor Santiago Osorio fue un homicidio.[127] Respondió que según las heridas que encontró en la espalda del cuerpo es compatible el cuadro de que el occiso haya tenido exposición en la espalda ante el agresor.[128]

Por todo ello, según consta de la *Minuta[129]*, el 26 de mayo de 2023, el presidente del jurado informó haber llegado a un veredicto en todos los casos. Tras el TPI examinar las boletas de veredicto, dársele lectura en sala, el foro primario aceptó los veredictos por entender que habían sido conforme a la prueba presentada y a la ley. Por lo cual, declaró al señor Centeno culpable y convicto en todos los casos.

Consecuentemente, el 17 de julio de 2023, el TPI emitió una *Sentencia* mediante la cual condenó al señor Centeno a un total de ciento treinta y nueve (139) años de prisión.[130]

---

[122] Íd., pág. 342, líneas 23-29, a la pág. 343, l. 1-2.
[123] Íd., pág. 344, líneas 14-19.
[124] Íd., pág. 350, líneas 3-24.
[125] Íd., pág. 350, líneas 25-30 a la pág. 356, líneas 1-9.
[126] Íd., pág. 356, líneas 10-30 a la pág. 358, líneas 1-17.
[127] Íd., pág. 358, líneas 19-22.
[128] Íd., pág. 358, líneas 23-30, a la pág. 359, líneas 1-23.
[129] Autos originales del caso, *Minuta* del 26 de mayo de 2023.
[130] Autos originales del caso, *Sentencia* en el Tomo 9.

Inconforme con la determinación del TPI, el 11 de agosto de 2023, el apelante presentó esta *Apelación criminal* en la que solicitó la revisión de las sentencias. Luego, solicitó que se ordenara la transcripción de oficio de la prueba oral desfilada en juicio.

Estipulada la TPO, el 21 de abril de 2025, el apelante presentó su *Alegato* en el que formuló los siguientes señalamientos de error:

> Erró el Tribunal de Primera Instancia al sostener los veredictos de culpabilidad emitidos por el jurado, a pesar de que la prueba de cargo fue altamente contradictoria por las múltiples versiones ofrecidas por el único testigo de cargo que alegadamente presenció los hechos y, como consecuencia, el Ministerio Público no cumplió su carga probatoria ya que no derrotó la presunción de inocencia y, mucho menos, estableció la culpabilidad del apelante más allá de duda razonable.

> Cometió error [el] Tribunal de Primera Instancia al sostener el veredicto del jurado de declarar culpable al apelante por dos cargos por infracciones al artículo 5.15 de la Ley de Armas, a pesar de que la prueba fue insuficiente en derecho.

En resumen, alegó que el Ministerio Público no cumplió con su carga probatoria sobre la culpabilidad del apelante. Adujo que el único testigo de cargo que vinculó al apelante con los delitos imputados, el señor Santiago García, ofreció tres (3) distintas versiones de los hechos a los agentes de la Policía que lo entrevistaron e incurrió en contradicciones en la declaración jurada y en el testimonio judicial. Adujo que en las primeras tres (3) entrevistas con los agentes de la Policía y en la declaración jurada prestada al Ministerio Público, cuatro (4) días después de la muerte de su hijo, el señor Santiago García incurrió en omisiones y contradicciones sustanciales que ponen en entredicho su credibilidad testifical. Por lo cual, solicitó que revoquemos las sentencias apeladas porque, a su juicio, no se estableció la culpabilidad más allá de duda razonable ni se rebatió la presunción de inocencia.

Por su parte, el 21 de mayo de 2025, el Pueblo de Puerto Rico presentó un *Alegato de el Pueblo de Puerto Rico* en el que solicitó que

confirmemos las sentencias apeladas. Arguyó que el testimonio del señor Santiago García fue consistente con relación a la identidad del señor Centeno cuando incluso lo señaló en múltiples ocasiones como el perpetrador de los delitos imputados y que no presentó contradicciones sobre los hechos medulares que reflejan cada uno de los elementos de los delitos imputados.

Arguyó que, en este caso, no hay duda de que ocurrió un asesinato debido a que se estableció que las heridas de bala fueron la causa de muerte del señor Santiago Osorio. Asimismo, adujo que quedó establecido más allá de duda razonable la comisión del delito de asesinato en grado de tentativa al probarse que el señor Centeno actuó con el propósito de asesinar al señor Santiago García, disparándole e hiriéndolo pero que no se consumó el asesinato porque su hijo se interpuso para protegerlo, resultando este último asesinado.

De otra parte, el Pueblo de Puerto Rico argumentó que el señor Santiago García fue consistente en cuanto a la descripción que ofreció sobre el señor Centeno sobre que lo hirió al dispararle con un arma de fuego y que asesinó a su hijo, y, que los detalles que alegadamente son contradictorios no cambian tales hechos.

Asimismo, sostuvo que, con el testimonio del examinador de armas, el señor Ramírez Negrón, se corroboró el relato del señor Santiago García al exponer en su informe que los casquillos y proyectiles recuperados de la escena eran calibre .40 y, posiblemente, provenientes de una pistola *Glock*. Sobre esto, adujo que se corrobora la versión de que el señor Centeno fue el único que disparó y que utilizó una sola arma de fuego que pudo ser una *Glock*, como la que usa la Policía. Además, arguyó que el lugar en que se encontraron los casquillos en la escena, así como el cadáver del señor Santiago Osorio demuestran que se cometió el delito de escalamiento agravado. También, alegó que se probó con el

testimonio del Agte. Velázquez el uso de un arma de fuego sin licencia y, unido al testimonio del señor Santiago García sobre que fue el señor Centeno quien les disparó a él y a su hijo, quedó demostrado que se cometieron las violaciones a los Art. 5.04 y 5.15 de la *Ley de Armas de Puerto Rico*, 25 LPRA ant. secs. 458d y 458n.

En fin, sostuvo que el jurado le dio entera credibilidad a la declaración del señor Santiago García, así como al resto de la prueba, la cual, a su juicio, demostró más allá de duda razonable que el señor Centeno incurrió en todos los delitos imputados. Por lo que solicitó que se confirme la *Sentencia* apelada.

**III.**

**A.**

La Constitución del Estado Libre Asociado de Puerto Rico consagra la presunción de inocencia de toda persona acusada. Art. II, Sec. 11, **Const. ELA**, LPRA, Tomo I. Así, se trata de un principio que permea todas las etapas del procedimiento penal. De ahí que se estatuya también en la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, en la que se establece que "[e]n todo proceso criminal, se presumirá inocente el acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá". Por todo esto, en los procesos judiciales penales, se coloca sobre el Ministerio Público el peso de la prueba y la obligación de satisfacer el estándar probatorio máximo de nuestro ordenamiento. *Pueblo v. Negrón Ramírez,* 213 DPR 895, 907 (2024); *Pueblo v. Toro Martínez,* 200 DPR 834, 856 (2018); *Pueblo v. Irizarry,* 156 DPR 780, 787 (2002). Esto quiere decir que, para establecer la culpabilidad de una persona acusada más allá de duda razonable, el Ministerio Público tiene que presentar suficiente evidencia sobre todos los elementos del delito y su conexión con la persona acusada. Íd.; *Pueblo v. García Colón I,* 182 DPR 129, 174 (2011); *Pueblo v. Ramos Álvarez,* 122 DPR 287,

315-316 (1988). De lo contrario, de carecer prueba sobre ello, el Ministerio Público incumpliría con su carga probatoria, lo cual supondría la absolución de la persona acusada respecto a dicho delito. Íd., pág. 908.

Ahora bien, ello no significa que el Ministerio Público vaya obligado a probar la comisión del delito con certeza matemática. Íd., pág. 907; **Pueblo v. Toro Martínez,** supra. Por el contrario, lo requerido es que se presente prueba satisfactoria y suficiente en derecho para producir "certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". Íd., pág. 908 (citas omitidas); **Pueblo v. García Colón I,** supra, págs. 174-175. De ahí que tampoco se requiere que toda duda posible sea descartada, sino que se venza la duda razonable, que es aquella duda no especulativa o imaginaria, que se produce tras una consideración justa, imparcial y serena de la totalidad de la evidencia del caso y que está fundamentada en el raciocinio de todos los elementos del juicio. Íd.; **Pueblo v. García Colón I,** supra, pág. 175. Así, nuestro más alto foro ha resuelto que hay duda razonable cuando el juzgador de los hechos siente en su conciencia insatisfacción o intranquilidad con la prueba de cargo presentada. **Pueblo v. García Colón I,** supra; **Pueblo v. Irizarry,** supra, pág. 788.

Según se desprende lógicamente de lo anterior, esta tarea de decidir si se probó la culpabilidad de la persona acusada más allá de duda razonable le corresponde primordialmente al juzgador de los hechos. **Pueblo v. Negrón Ramírez,** supra. Esto es, al jurado o, en su defecto, al juez o la jueza. Al hacerlo, la persona juzgadora de los hechos está llamada a evaluar y aquilatar la evidencia desfilada para determinar qué hechos quedaron probados. Íd. En ese oficio, los juzgadores de instancia están en la mejor posición para evaluar, aquilatar y adjudicar la prueba que se presenta ante ellos. Íd., pág.

910; **Pueblo v. García Colón I,** supra, pág. 165. Ello cobra especial importancia cuando se trata de la evaluación y adjudicación de la credibilidad de un testigo. **Pueblo v. García Colón I,** supra. Al final del día, son estos funcionarios quienes pueden formar convicciones sobre la verdad de los hechos al escuchar y observar la forma de declarar de los testigos, su comportamiento, sus gestos, sus pausas, sus contradicciones y sus manierismos. **Pueblo v. Negrón Ramírez,** supra; **Pueblo v. García Colón I,** supra, citando a **Argüello v. Argüello,** 155 DPR 62, 78 (2001).

Por todo ello, si desfilada la totalidad de la prueba el juzgador de los hechos entiende que se ha superado con satisfacción el estándar antes mencionado, se han establecido todos los elementos del delito y se ha demostrado la conexión de la persona acusada con ellos, entonces está obligado a encontrar a la persona acusada culpable del delito. **Pueblo v. Negrón Ramírez**, supra, pág. 909.

Ahora bien, llegado el fallo condenatorio, la Regla 193 de Procedimiento Criminal, *supra*, R. 193, le garantiza el derecho a la persona así convicta de apelarlo ante el Tribunal de Apelaciones. Dicho foro apelativo, a su vez, tiene la facultad de revisar la determinación de culpabilidad porque la apreciación del foro primario y su fallo son una cuestión mixta de hecho y de derecho sujeta a revisión por tribunales de mayor jerarquía. **Pueblo v. Negrón Ramírez**, supra.

En ejercicio de su prerrogativa adjudicativa, los tribunales apelativos están obligados a reconocerle gran deferencia a la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realiza el foro primario, especialmente aquellas que están basadas en prueba oral. Íd.; **Pueblo v. Rivera Montalvo,** 205 DPR 352, 373 (2020); **Pueblo v. García Colon I,** supra, pág. 165. Por consiguiente, como norma general, los tribunales apelativos no intervendrán en esos asuntos.

*Pueblo v. Rivera Montalvo,* supra. Esta limitación emana, precisamente, de la posición preferente que ocupa el foro inferior con respecto a la prueba. *Pueblo v. Negrón Ramírez,* supra. Los foros apelativos no podemos obviar esa realidad. *Pueblo v. Casillas, Torres,* 190 DPR 398, 416 (2014).

No obstante, como con toda norma general, nuestro ordenamiento reconoce ciertas excepciones que facultan a los tribunales apelativos a descartar la doctrina de deferencia. *Pueblo v. Negrón Ramírez,* supra, pág. 909. Principalmente, se ha establecido que los tribunales apelativos podrán sustituir el criterio utilizado por el foro primario cuando se demuestre que este actuó con pasión, prejuicio o parcialidad, incurrió en craso abuso de discreción, en error manifiesto o en error de derecho. Íd., pág. 912; *Pueblo v. Rivera Montalvo,* supra; *Pueblo v. García Colon I,* supra. Si la persona que apela un fallo o veredicto en su contra aduce que el juzgador de los hechos ha errado en su apreciación de la prueba testifical, entonces se requiere como condición para la intervención apelativa que el foro sentenciador haya incurrido en las acciones antes mencionadas o cometido los tipos de error antes aludidos. Íd.

En este contexto, nuestro Tribunal Supremo ha definido *pasión, prejuicio y parcialidad* como "aquellas inclinaciones personales de tal intensidad que llevan a un juzgador a actuar movido por estas y a adoptar posiciones, preferencias o rechazos con respecto a las partes o sus causas, sin admitir cuestionamientos sobre estas y sin importar la prueba que se haya presentado en el juicio". Íd.; *Pueblo v. Rivera Montalvo,* supra, pág. 374.

Igualmente, ha fijado que un tribunal incurre en *abuso de discreción* cuando el juez o la jueza ignora sin razón un hecho material que no podía desatender, basa su decisión principalmente en un hecho inmaterial al que le da demasiado peso o realiza un

análisis liviano y el dictamen es irrazonable. Íd., pág. 913, citando a *Pueblo v. Rivera Montalvo,* supra; *Pueblo v. Ortega Santiago,* 125 DPR 203, 211-212 (1990).

Al igual, ha precisado que el juzgador de los hechos comete un *error manifiesto* si la apreciación de la prueba se distancia de la realidad fáctica o si resulta inherentemente imposible o increíble. *Pueblo v. Rivera Montalvo,* supra, citando a *Pueblo v. Irizarry,* supra, pág. 816. En ese mismo tenor, ha puntualizado que también se incurre en *error manifiesto* cuando, aunque haya prueba para sostener las determinaciones de hechos, el foro apelativo resuelve que se cometió un error y que "las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". *Pueblo v. Negrón Ramírez,* supra, págs. 912-913 (citas omitidas).

Asimismo, se entiende por *error de derecho* el que se hace al actuar sin ceñirse a lo dispuesto por una norma jurídica vigente. *E.L.A. v. Crespo Torres,* 180 DPR 776 (2011).

En esencia, el foro apelativo tiene el deber de dejar sin efecto el fallo o veredicto condenatorio cuando un análisis de la prueba que tuvo ante sí el foro primario arroja dudas serias, razonables y fundadas sobre la culpabilidad de la persona acusada. *Pueblo v. Santiago et al.,* 176 DPR 133, 148 (2009); *Pueblo v. Carrasquillo Carrasquillo,* 102 DPR 545, 551 (1974).

**B.**

En lo pertinente a este caso, el Artículo 92 del Código Penal, *supra,* sec. 5141, prescribe que el asesinato es "dar muerte a un ser humano a propósito, con conocimiento o temerariamente". Asimismo, el Artículo 93 del Código Penal, *supra,* enumera las instancias en las que un asesinato constituye asesinato en primer grado. Entre ellas, en el inciso (a), incluye "[t]odo asesinato perpetrado por medio de veneno, <u>acecho</u>, tortura, estrangulamiento,

sofocación o asfixie posicional, o <u>a propósito o con conocimiento</u>". De resultar una persona convicta por asesinato en primer grado, el Artículo 94 del Código Penal, *supra*, sec. 5143, mandata que se le imponga una pena de reclusión por un término fijo de noventa y nueve (99) años.

El Artículo 35 del Código Penal, *supra,* sec. 5048 establece que existe tentativa cuando la persona "actúa con el propósito de producir el delito o con conocimiento de que se producirá el delito, y la persona realiza acciones inequívoca e inmediatamente dirigidas a la consumación de un delito que no se consuma por circunstancias ajenas a su voluntad". En virtud de los Artículos 35 y 92 del Código Penal, *supra*, comete tentativa de asesinato quien "realiza acciones o incurre en omisiones inequívocamente dirigidas" a "dar muerte a un ser humano con malicia premeditada", frustrándose su consumación por circunstancias ajenas a su voluntad. ***Pueblo v. Carmona, Rivera***, 143 DPR 907, 914 (1997).

El Artículo 194 del Código Penal, supra, pág. 5264, establece que incurrirá en el delito grave de escalamiento toda persona que penetre en una propiedad, "con el propósito de cometer cualquier delito de apropiación ilegal o cualquier delito grave". De resultar convicta, será sancionada con una pena de reclusión por un término fijo de tres (3) años. Íd.  Se considera escalamiento agravado, si aquel descrito en el Artículo 194 se comete en cualquiera de las siguientes circunstancias: (a) en un edificio ocupado, o en cualquier otro lugar donde la víctima tenga una expectativa razonable de intimidad; (b) en aquella propiedad asignada por el gobierno para brindar vivienda pública; o (c) cuando medie forzamiento para la penetración. Artículo 195 del Código Penal, *supra*, sec. 5265.

Por otro lado, la derogada Ley de Armas de 2000, *supra* ant. secs. 455 *et seq.*, regulaba la concesión de licencias para tener, poseer y portar armas, pero, sobre todo, establecía delitos

relacionados a la posesión o el uso de armas, las penas por su comisión y la forma de cumplirlas.[131]

Con ese propósito, el Artículo 5.04 de la Ley de Armas de 2000, *supra,* prescribía el delito de portación y uso de armas de fuego sin licencia al disponer lo siguiente:

> Toda persona que transporte cualquier arma de fuego o parte de ésta, sin tener una licencia de armas, o porte cualquier arma de fuego sin tener su correspondiente permiso para portar armas, incurrirá en delito grave y convicta que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años, sin derecho a sentencia suspendida, a salir en libertad bajo palabra, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinte (20) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de cinco (5) años.
> [...]

Asimismo, el Artículo 5.15 de la Ley de Armas de 2000, *supra,* preceptuaba el delito de disparar o apuntar armas, definiéndolo en parte como sigue:

> (A) Incurrirá en delito grave toda persona que, salvo en casos de defensa propia o de terceros o de actuaciones en el desempeño de funciones oficiales o de actividades legítimas de deportes, incluida la caza, o del ejercicio de la práctica de tiro en un club de tiro autorizado:
> (1) voluntariamente dispare cualquier arma en un sitio público o en cualquier otro sitio, aunque no le cause daño a persona alguna, o
> (2) intencionalmente, aunque sin malicia, apunte hacia alguna persona con un arma, aunque no le cause daño a persona alguna. La pena de reclusión por la comisión de los delitos descritos en los incisos (1) y (2) anteriores, será por un término fijo de cinco (5) años.
> De mediar circunstancias agravantes, la pena establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año.
> Disponiéndose que, aquella persona que cometa el delito descrito en el inciso (1) anterior, utilizando un arma de fuego y convicto que fuere, no tendrá derecho a sentencia suspendida, a salir en libertad bajo palabra, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta.
> Del mismo modo, cuando una persona cometa el delito descrito en el inciso (2) anterior, utilizando un arma de fuego, mediando malicia y convicto que fuere, no tendrá derecho a sentencia suspendida, a salir en libertad bajo palabra o a

---

[131] Este estatuto era el vigente al momento de los hechos de este caso y fue derogado por la Ley de Armas de Puerto Rico de 2020 (Ley de Armas de 2020), Ley Núm. 168 de 2020, según enmendada, 25 LPRA secs. 461 *et seq.*

disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta.
[...]

Sobre las penas dispuestas en estos y los demás delitos codificados por este estatuto, el Artículo 7.03 de la Ley de Armas de 2000, *supra*, instituía el agravamiento de las penas impuestas a su amparo. En específico, dispuso:

> [...]
> Todas las penas de reclusión que se impongan bajo esta Ley serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley. Además, si la persona hubiere sido convicta anteriormente por cualquier violación a esta Ley o por cualquiera de los delitos especificados en el Artículo 2.11 de esta Ley o usare un arma en la comisión de cualquier delito y como resultado de tal violación alguna persona sufriera daño físico o mental, la pena establecida para el delito se duplicará.
> [...]

Así, requería que: (1) se cumplieran consecutivamente las penas impuestas mediante dicho estatuto frente a otras penas por otras leyes; y (2) que la pena por un delito se duplicara cuando una persona usara un arma en la comisión de cualquier delito y como resultado de ello una persona sufriera daño físico o mental.

Por otra parte, cabe destacar que el Artículo 7.25 de la Ley de Armas de 2020, *supra* sec. 467l, estableció una cláusula de reserva respecto a las penas impuestas por violaciones a la Ley de Armas de 2000, *supra*, y el modo de ejecutarlas. De ordinario, las cláusulas de reserva son limitaciones al principio de favorabilidad. ***Pueblo v. DiCristina Rexach,*** 204 DPR 779, 788 (2020). Mediante estas, se asegura que las leyes derogadas o enmendadas sean aplicadas a los hechos acaecidos durante su vigencia, independientemente de que el estatuto posterior le sea más favorable o desfavorable. Íd., pág. 787-788. Este es un ejercicio de una prerrogativa que recae enteramente en el legislador y la legisladora. Íd., pág. 787.

Además, en todo caso, la Ley de Armas de 2020, *supra*, conservó las mismas penas dispuestas por los delitos de portación

o uso de armas de fuego y de disparar o apuntar un arma. Véanse los Artículos 6.05 y 6.14 de la Ley de Armas de 2020, *supra* secs. 466d y 466m. También, mantuvo la duplicación de penas y el cumplimiento de penas consecutivas. Véase Artículo 6.01 de la Ley de Armas de 2020, *supra* ant. sec. 466.

**C.**

El derecho a juicio por jurado se encuentra consagrado expresamente en la Sexta Enmienda de la Constitución de Estados Unidos. Emda. VI, **Const. EEUU**, LPRA, Tomo 1. Sobre este se dispuso que:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation [...].

La Corte Suprema Federal incorporó, por vía de la Decimocuarta Enmienda de la Constitución de Estados Unidos, los derechos fundamentales contenidos en la Carta de Derechos. Entre estos derechos fundamentales, el Máximo Tribunal Federal reconoció el derecho a juicio por jurado, inherente al debido proceso de ley. *Duncan v. State of Louisiana*, 391 US 145 (1968); Véase, además, *Balzac v. Porto Rico*, 258 US 298 (1922).

En Puerto Rico, se reconoce el derecho a juicio por jurado en casos de delitos graves e incluso, en ciertas circunstancias, al acusado de un delito menos grave. Regla 111 de Procedimiento Criminal, 34 L.P.R.A. Ap. II; *Pueblo v. Negrón Ayala*, 171 DPR 406, 413 (2007). Nuestra Constitución lo consagra en la Sec. 11 del Art. II, específicamente. En la Carta de Derechos de la Constitución del ELA se dispuso expresamente que: "[e]n los procesos por delito grave el acusado tendrá derecho a que su juicio se ventile ante un jurado imparcial compuesto por doce vecinos del distrito". Art. II, Sec. 11, **Const. ELA**, LPRA, Tomo 1.

En estos casos, es la encomienda principal del Jurado, ser el juzgador de los hechos. *Pueblo v. Negrón Ayala*, supra. El jurado habrá de determinar si la culpabilidad del acusado fue probada más allá de duda razonable, así como el delito o grado por el cual deba responderle a la sociedad. *Pueblo v. Negrón Ayala*, supra, págs. 413–414 (2007); *Pueblo v. Cruz Correa*, 121 DPR 270, 277 (1988). Son las instrucciones el mecanismo procesal utilizado para que el jurado conozca el derecho aplicable al caso. *Pueblo v. Rodríguez Vicente*, 173 DPR 292, 297 (2008). Además, el Jurado tras ser el juzgador llamado a aquilatar la prueba desfilada es a quien le corresponde decidir si le da crédito o no. *Pueblo v. Negrón Ayala*, supra, pág. 414.

Recientemente, en *Pueblo v. Torres Rivera II*, 204 DPR 288 (2020), el Tribunal Supremo adoptó la norma pautada por el Tribunal Supremo federal en *Ramos v. Louisiana*, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020), para requerir un veredicto unánime en un procedimiento penal en el cual se imputa la comisión de un delito grave. Íd., pág. 300.

**IV.**

En el caso de marras, de forma unánime, luego de aquilatar la prueba desfilada ante sí, un jurado declaró culpable al apelante en todos los delitos imputados, y el TPI así lo sentenció. En consecuencia, el apelante fue condenado a ciento treinta y nueve años de prisión.

El apelante señaló, en esencia, que el TPI incidió al sostener los veredictos de culpabilidad que emitió el jurado ya que la prueba de cargo fue contradictoria por múltiples versiones ofrecidas por el único testigo que alegadamente presenció los hechos. Por ello, arguyó que el Ministerio Publico no cumplió con su carga probatoria de derrotar la presunción de inocencia y establecer, más allá de duda razonable, la culpabilidad del señor Centeno en todos los

delitos imputados. Además, adujo que la prueba sobre las infracciones al Artículo 5.15 de la Ley de Armas, *supra*, fue insuficiente en derecho por lo que también incidió el TPI al sostener el veredicto de culpabilidad del jurado.

Para el apelante, el señor Santiago García ofreció tres versiones distintas de los hechos ocurridos el 4 de enero de 2016 a los agentes de la Policía e incurrió en contradicciones en su declaración jurada y testimonio judicial. Esto, teniendo efecto en su credibilidad como testigo y en crear duda en su culpabilidad del apelante, no habiendo el Ministerio Publico cumplido con su carga probatoria ni rebatido la presunción de inocencia. En resumen, alegó que el señor Santiago García omitió detalles a lo largo de las varias entrevistas que tuvo con los agentes de la Policía desde la ocurrencia de los hechos hasta su declaración jurada con el Ministerio Público y testimonio judicial.

Por su parte, el Pueblo de Puerto Rico adujo que, la prueba presentada corroboró la versión del señor Santiago García, y que esta fue merecedora de la credibilidad que le dio del jurado. Así, argumentó que el Ministerio Publico probó más allá de duda razonable que el apelante cometió los delitos imputados. Alegó que se probaron todos los elementos de cada uno de los delitos, así como la conexión de estos con el señor Centeno. Además, sostuvo que el señor Santiago García fue consistente e insistente en cuanto a la identificación del señor Centeno. En fin, arguyó que el resto de los testimonios corroboraron la versión de los hechos del señor Santiago García y que no hay versiones distintas sobre los hechos constitutivos del acto delictivo.

Tras un pormenorizado análisis objetivo, sereno y cuidadoso de los argumentos de las partes, con el beneficio de un cuidadoso análisis de la voluminosa TPO estipulada, evaluar la totalidad del expediente y consignar la normativa jurídica atinente, procedemos

a atender los errores imputados al foro sentenciador. Como lo discutieron así las partes, se atienden los señalamientos de error en conjunto por estar íntimamente relacionados entre sí.

En el caso de marras, el juzgador tuvo la oportunidad de escuchar ampliamente los testimonios de los testigos y apreciar su comportamiento en sala. Surge claramente de la TPO que el señor Santiago García mantuvo un relato consistente y claro en su testimonio en cuanto a la descripción del atacante. Además, de las distintas maneras en que quedó recogida su versión, entiéndase las entrevistas con los agentes de la Policía según estos testificaron, como de su propio testimonio, consta, de manera consistente e indubitada, que fue el señor Centeno la persona que inicialmente pasó frente a su propiedad y posteriormente regreso y penetró, apuntó y disparó con un arma de fuego, como la que usan los policías, al señor Santiago García y a su hijo, resultando este último muerto. El señor Santiago García describió en múltiples ocasiones al perpetrador de los delitos como trigueño, flaco, de nariz ancha y con estilo de jaquetón. Asimismo, respondió en múltiples ocasiones que su hijo le dijo que se trataba de "Nelsito" y que "era del caserío de la playa". Durante el proceso del *line-up* fotográfico, el señor Santiago García, único testigo ubicado en la escena, seleccionó al señor Centeno como esa persona que les disparó sin duda alguna.

Incluso, es de notar que, los testimonios de los agentes de la Policía que lo entrevistaron con posterioridad al suceso del 4 de enero de 2016 coincidieron con la versión ofrecida por el señor Santiago García. Es decir, existe armonía entre todos los testimonios que versaron sobre la identificación del apelante como causante de los hechos ocurridos y culpable de los delitos por los cuales fue acusado. Además, la prueba testifical avala la teoría de que, si el señor se encontraba en el patio de su casa debajo de la carpa, tenía amplia visibilidad hacia la carretera.

De otra parte, de los testimonios de los distintos agentes surge manifiestamente que cada cual tiene su función particular al momento de trabajar una escena criminal o comenzar un proceso de investigación para dar con la persona responsable. Por ello, en el caso de marras, los hechos concisos y la identificación de la persona responsable, relatada por el único testigo de los hechos, se perciben en más detalle mediante el testimonio del agente investigador, el Agte. Velázquez Paz.

En vista de todo lo anterior, es forzoso concluir que el Ministerio Público, por medio de la evidencia testifical y documental desfilada, probó todos los elementos de los delitos imputados en contra del señor Centeno. Las presuntas omisiones o contradicciones del señor Santiago García en nada cambian la teoría sostenida por el Ministerio Público sobre quién fue el responsable de la comisión de los delitos. La prueba desfilada claramente le permitía al jurado concluir, más allá de duda razonable, que el señor Centeno cometió los delitos por los cuales se le acusó. En consecuencia, el Estado rebatió satisfactoriamente la presunción de inocencia del señor Centeno.

Según pormenorizado previamente, la presunción de inocencia se rebate con presentación de evidencia que establezca la culpabilidad más allá de duda razonable, esto es, presentando prueba de todos los elementos del delito y la conexión con el acusado. *Pueblo v. Toro Martínez*, supra, págs. 855-856. Además, como mencionáramos, las sentencias dictadas en procesos criminales ante el foro de instancia merecen gran deferencia. Por ello, no debemos intervenir con la apreciación y adjudicación de credibilidad que le atribuyó el juzgador, en este caso el jurado, a la prueba testifical, quien tuvo la oportunidad de apreciar y evaluar de manera directa la prueba que impugna el apelante.

Ciertamente, en el caso de marras, coincidimos con el jurado en que no existe duda razonable y/o insuficiencia de prueba para dejar sin efecto un veredicto de culpabilidad sobre el apelante. "[A]l evaluar si se probó la culpabilidad de un acusado más allá de duda razonable, los foros apelativos no debemos de hacer abstracción de la ineludible realidad de que los jueces de primera instancia y los jurados están en mejor posición de apreciar y aquilatar la prueba y los testimonios presentados". *Pueblo v. Casillas, Torres*, supra, pág. 416; *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000). Téngase presente que esta norma de deferencia apelativa aplica con igual rigor cuando lo que se tiene ante consideración del foro revisor es un veredicto de culpabilidad emitido por un jurado. *Pueblo v. Negrón Ramírez*, supra, pág. 914.

Por todo lo anterior, concluimos que no se cometieron los errores señalados por lo que no existe razón por la cual debamos intervenir con lo determinado por los miembros del jurado así que nos corresponde confirmar la *Sentencia* apelada. En el caso de marras, el veredicto se sostiene ampliamente en la prueba desfilada ante el TPI, por lo que resolvemos que los errores imputados no se cometieron.

**V.**

Por los fundamentos anteriormente esbozados, se confirma la *Sentencia* apelada.

Lo acordó el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solis
Secretaria del Tribunal de Apelaciones